# EXHIBIT

# A

## AGREEMENT

THIS AGREEMENT, (the "Agreement") is made effective the 25th day of JANUARY, 2019 (the "Effective Date") by and between Lake Erie College, 391 West Washington Street, Painesville, Ohio 44077 ("LEC") and Metz Culinary Management, Inc., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania ("Metz") with offices located at Two Woodland Drive, Dallas, Pennsylvania 18612.

## BACKGROUND

A. Metz is engaged in the business of supplying food management service to public and private institutions in the continental United States in connection with the operation of such institutions' food services programs.

B. LEC desires to have Metz operate and manage the LEC dietary and food services operations and provide such other services or operate and manage such other activities as more fully described in Article 1 hereof.

C. Metz desires to provide LEC with the Services (as such term is defined in Article 1 hereof) on the terms and conditions set forth herein.

Now therefore, in consideration of the promises and the mutual agreements and covenants hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, the parties mutually agree as follows with the intention of being legally bound hereby:

## ARTICLE 1

## SCOPE OF SERVICES

1.1     All paragraphs of the Background are incorporated herein by reference as if fully set forth at length.

1.2     LEC agrees to retain Metz and Metz agrees to accept such engagement from LEC, to exclusively operate all on-campus foodservice and on-campus catering services (collectively, the "Services"). The Services shall not include vending operations. The catering programs and other foodservice operations of LEC shall be collectively referred to as the "Program".

1.3     LEC agrees to furnish to Metz throughout the term of this Agreement and any extensions or renewals thereof facilities for the performance of the Services, which facilities shall be completely and fully equipped and furnished to the mutual satisfaction of Metz and LEC (collectively, the "Facility").

1.4     LEC will maintain the Facility in accordance with all statutes, regulations, ordinances, directives and/or rules of governmental bodies or agencies or public health agencies applicable to LEC and the operation of the Program ("Applicable Law"). All items furnished by LEC for use in the Facility (the "Property") shall remain the sole property of LEC, and LEC shall, at its sole cost and expense, maintain and make all necessary repairs or replacements to such Property and the Facility, except that Metz shall be responsible for all damage to the Property and the Facility (other than as provided in Section 7.5 hereof) caused by the gross negligence, and/or intentional wrongful acts or omissions of Metz.

1.5     LEC retains the right to access and to permit its designees to access the Facility at any time, and without prior notice to Metz, for purposes of conducting sanitation, safety and licensure inspections, auditing Metz's compliance with this Agreement, responding to emergencies, conducting emergency preparedness drills, and other business necessities as determined by LEC.

1.6     Metz agrees to furnish any and all necessary qualified personnel (the "Metz Personnel") to operate the Program. Metz shall be responsible for recruiting, hiring, employing, compensating, training, supervising and managing all Metz Personnel under this Agreement. Nothing contained herein, or in the relationship of the parties, shall constitute or be deemed or construed to create an employment, an agency, a partnership or a joint venture relationship between LEC and any Metz personnel. If LEC desires that any Metz Personnel be removed from the campus or from performance of the Services for any lawful reason, LEC shall provide written notice to Metz, and Metz shall, upon the reasonable request of LEC and subject to applicable law, promptly remove said Metz Personnel from the Campus and future work schedules. Metz shall provide a mutually acceptable replacement for such Metz Personnel within a reasonable period of time thereafter.

1.7     Metz and shall bill LEC who shall pay to Metz, in accordance with Article 2 hereof, the costs of the wages and/or salaries of the Metz Personnel together with a percentage rate of thirty percent (30%) of payroll relative to direct and indirect payroll taxes, workers' compensation insurance, employer's portion of state and federal unemployment compensation tax, social security tax, accident and health insurance, life insurance and 401(k) contributions, incentive pay, fringe benefits and related overhead. The percentage rate may be increased as necessary to cover increased costs and expenses.

1.8     Metz will determine the specifications for food and other supplies to be used in the Program and shall order quality food and supplies based on such specifications. Metz shall be entitled to utilize Metz's national account or other vendor systems to purchase food and supplies for the Program and Services. In the event any of Metz's vendors extend to Metz any credits, rebates or discounts related to Metz's business or related to Metz's relationships or business dealings with such respective vendors, including but not limited to any early payment discounts or volume discounts, Metz shall be entitled to exclusively retain such credits, rebates or discounts. Metz shall not be obligated to use or accept food or supplies from any vendor that does not meet the insurance and/or quality assurance requirements as may be established by Metz from time to time in its sole discretion.

1.9     Notwithstanding any other provision of this Agreement, Metz agrees to abide by the terms of any pouring rights agreement to which LEC is a party.

1.10    Upon termination or expiration of this Agreement, LEC shall purchase or cause the successor to Metz to purchase Metz's inventory of all food and supplies not previously invoiced to LEC and purchased by Metz.

1.11    The parties' respective operational responsibilities for providing and paying vendors directly for the following items are indicated below:

|  | METZ | LEC |
|---|---|---|
| Food | X |  |
| Office supplies/stationery | X |  |
| In-service training materials/supplies | X |  |
| SOP Manual, Recipe Catalogue, Safety Manual | X |  |
| Short life equipment |  |  |

| | Metz | LEC |
|---|---|---|
| pots/pans/utensils/knives for preparation and/or service | | X |
| Telephone service | | X |
| Telephone long distance (Review Quarterly) | | X |
| Internet Service | | X |
| Professional Services | | X |
| Sub-contracted Services | | X |
| Laundry | X | |
| China / Silverware / Glassware and Replacements | | X |
| Cleaning / Dishwashing supplies | X | |
| Menu paper and printing | X | |
| Photocopying | X | |
| Kitchen paper / plastic | X | |
| Kitchen Knife Sharpening | X | |
| Marketing / merchandising materials for daily operation | X | |
| Business licenses and permits | X | |
| Computer hardware/printer paper | X | |
| Computer software | X | |
| Computer hardware & software support | X | |
| Computer related charges | X | |
| Repairs – purchased services | | X |
| Rented / leased equipment | | X |
| Non-electric equipment replacement (Smallwares) | | X |
| Minor equipment replacement (under $500) | | X |
| Major equipment replacement (over $500) | | X |
| Utilities | | X |
| Pest Control | | X |
| Garbage / trash removal from kitchen to dumpster | X | |
| Dumpster service | | X |
| Service Contracts | | X |
| Postage | X | |
| Uniforms (approved by LEC) | X | |
| Hood Cleaning & Fire Suppression Services | | X |
| Dish machine maintenance and repair | | X |

    1.12    The parties shall provide cleaning responsibilities as follows:

| | Metz | LEC | Frequency |
|---|---|---|---|
| **Kitchen** | | | |
| Floors | X | | Daily |
| Walls (up to 6 feet) | X | | Weekly |
| Walls (above 6 feet) | | X | Weekly |
| Equipment | X | | Daily |
| Refrigerators and Freezers | X | | Daily |
| Vents | | X | Quarterly |
| Ceiling | | X | As Needed |
| Ducts | | X | Annually |
| Light bulb replacement | | X | As Needed |
| **Storage Areas** | | | |
| Floors | X | | Daily |
| Walls (up to 6 feet) | X | | Monthly |
| Walls (above 6 feet) | | X | Monthly |

Metz Culinary Management_ LEC(2019)    3

| | | | |
|---|---|---|---|
| Ceiling | | X | As Needed |
| Shelving | X | | Daily |
| Light bulb replacement | | X | As Needed |
| **Café/Deli/Servery** | | | |
| Serving line/equipment | X | | Daily |
| Serving line walls(up to 6 feet) | X | | Daily |
| Serving line walls(above 6 feet) | | X | Daily |
| Serving line floor/tile | X | | Daily |
| Light bulb replacement | | X | As Needed |
| Ceiling | | X | As Needed |
| **Dining Area** | | | |
| Furniture | X | | Daily |
| Equipment | X | | Daily |
| Floors/Walls(up to 6 feet) | X | | Daily |
| Floors/Walls(above 6 feet) | | X | Daily |
| Ceiling | | X | As Needed |
| Windows finishes/drapery | | X | Annually |
| Light bulb replacement | | X | As Needed |
| Front Door Glass | X | | As Needed |
| Deep clean carpets | | X | Annually |
| Buff/polish floors | | X | Annually |
| **Shipment Receiving Area** | | | |
| Pressure Wash | X | | Weekly |
| Daily Polishing, Pick-up/spot mop | X | | Daily |
| Dumpster Monitoring | X | | Daily |
| Light bulb replacement | | X | As Needed |
| **Other** | | | |
| Art Work | | X | Monthly |

    1.13    Notwithstanding any other provision of this Agreement, the parties acknowledge and agree that with respect to any paper or plastic items that are to be consumed by the public and/or the authorized recipients or purchasers of the food service provided in the Program, including but not limited to napkins, straws, containers, plates, cups, table cloths and utensils, (the "Paper Products") such Paper Products shall be purchased by Metz as agent for and in the name of LEC and LEC hereby acknowledges and agrees that title to the Paper Products shall at all times remain vested with LEC. With respect to all cleaning supplies utilized in connection with the Program, including but not limited to cleaners, soaps, brooms, mops, brushes, dust rags, buckets, polishers, scrubbers, ladders, grease guns and oil cans, (the "Cleaning Supplies") such Cleaning Supplies shall be purchased by Metz as agent for and in the name of LEC and LEC hereby acknowledges and agrees that title to the Cleaning Supplies shall at all times remain vested with LEC.

**ARTICLE 2**

**COMPENSATION**

    2.1    All costs of operating the Program and rendering the Services shall be borne by LEC, including but not limited to the above referenced payroll costs. Metz shall invoice such costs to LEC on a monthly basis, which invoices shall be due and payable by LEC within ten (10) days following receipt. Metz shall invoice LEC for catered events and special functions following each such function, which invoices shall be due and payable by LEC within ten (10) days following receipt.

Prior to the commencement of each year of the Agreement, Metz shall enter into discussions and confer with LEC for the purpose of formulating the proposed budget for such year and Metz shall prepare and present the proposed budget for approval by LEC, which approval shall not be unreasonably withheld. LEC shall be entitled to receive any net profits generated by the operation of the Program. However, should there be losses in the operation of the Program, such losses shall be borne by LEC. Nothing contained in this Agreement shall be construed as a representation by Metz that the operation of the Program shall result in a profit to LEC or a guarantee that any budgetary goals shall be attained.

2.2     Metz's services and pricing for catered events and special functions shall be as mutually agreed upon by the parties. LEC shall be responsible for collecting revenues for catered events, special functions and all revenue generating activities.

2.3     All daily cash and credit sales received from the Program shall be collected by Metz and credited against invoices payable by LEC.

2.4     LEC further agrees to pay to Metz a combined management and administrative fee of $9,276.33 per month. The management/administrative fee set forth above shall be subject to a negotiated increase annually, which increase shall in no event be less than $1,500 per year. If the Facility is located in a jurisdiction that imposes a sales tax or other tax on the fees of Metz, such tax shall be paid monthly by LEC together with the payment of fees.

2.5     On or before the Effective Date, Metz shall provide to LEC funds in the amount of $450,000 that may be used for (i) improvements to the dining facilities of the Program, including but not limited to renovations of the dining hall, the replacement of the carpet in the dining hall, renovations to the library and/or (ii) the payment of any invoices that are due from LEC to Metz. The parties acknowledge that part of the funds will be used to reimburse LEC for the costs of stone countertops.

2.6     Notwithstanding any other provision of this Agreement, if this agreement were to terminate prior to the expiration of the full one hundred and twenty (120) month term for any reason (including but not limited to a termination by LEC due to a default by Metz), LEC shall pay to Metz within ten (10) days following such termination an amount equal to the remaining months of the one hundred and twenty (120) month term multiplied by $5,109.66. The parties acknowledge that this payment is in addition to any other rights or remedies Metz might have under the Agreement and/or at law or in equity, including but not limited to recovery of any unpaid combined management and administrative fee payments for any prior months of the term. This obligation of LEC shall not be construed as a penalty but rather is a reimbursement to Metz of unamortized portions of investments Metz has made and/or has agreed to make in reliance upon this Section 2.6, which investments are of substantial value and from which LEC and the Program have and will continue to derive substantial direct and indirect benefit. This obligation of LEC shall survive the termination of this Agreement.

2.7     In the event LEC disputes any billing by Metz, LEC shall notify Metz in writing within fifteen (15) days of the date of such billing as to the amount of the billing in dispute and the reason for such dispute. Any sums that are unpaid after the above specified periods shall bear interest at the lesser of 1.5% per month or the maximum amount permitted by law accruing from the date such sums are due and owing to the date of payment. Acceptance by Metz of less than full payment on any billing or billings shall not be a waiver of any of Metz's rights to collect the entire balance of such billing or billings plus interest, if any.

## ARTICLE 3
## TERM AND TERMINATION

      3.1    The initial term of this Agreement will extend from the Effective Date for a period of ten (10) years, unless earlier terminated as follows: (a) by Metz, at its option, upon twenty (20) days prior written notice of termination to LEC following the failure of LEC to pay any undisputed amount due pursuant to this Agreement, or (b) by LEC, at its option, upon twenty (20) days prior written notice of termination to Metz following the failure of Metz to pay any undisputed amount due pursuant to this Agreement, or (c) by either party, immediately, upon written notice to the other party of the other party's default in its material obligations hereunder (other than the failure to pay any amounts due, which is addressed in Article 3, Section 3.1 (a) and (b) above) and such default is not remedied within thirty (30) days after receipt of the written notice specifying the default or (d) by either party, without cause, following the first year of this Agreement upon one hundred twenty (120) days advance written notice to the other party; provided, however, that the effective date of any termination by Metz without cause shall not occur during a semester.

      3.2    Upon termination of this Agreement, all rights and obligations of the parties under this Agreement will immediately cease and terminate (except for compensation accrued and unpaid to Metz as of the date of termination, compensation accrued and unpaid to LEC as of the date of termination, and the rights and obligations of Metz and LEC pursuant to Articles 2, 6, 7, 10 and 13, all of which will survive such termination).

      3.3    Within seven (7) business days following either party's receipt of a notice of termination of this Agreement, the parties shall meet to discuss the transition of the Services and to account for any amounts due from one party to the other. Notwithstanding Section 2.1, once a notice of termination is issued for any reason, all uncontested invoices shall be due within five (5) days of LEC's receipt of the invoice.

## ARTICLE 4
## PROVISIONS RELATING TO INVENTORY OF
## SMALLWARES AND OTHER ITEMS

      LEC shall be responsible for the purchase of all smallwares for the Program. New items or increased inventory level requirements will be the responsibility of LEC. Metz shall take such steps as may be reasonably required by LEC for the protection against loss by pilferage or destruction.

## ARTICLE 5
## COMPLIANCE WITH LAWS

      5.1    Metz agrees to comply with all Applicable Laws, and will operate the Program and provide the Services in accordance with good sanitation practices and as mandated by federal and state laws and regulations and local regulations and ordinances applicable to the Program.

      5.2    LEC will collect, be responsible for and remit to the appropriate taxing authority all sales taxes imposed upon revenues generated from sales in the Program, excluding revenues generated from sales of in-house vending machines for which LEC is directly responsible.

      5.3    LEC will pay or, if already paid by Metz, will reimburse Metz for any liquor license fees where applicable and permitted by law, personal property taxes on equipment or investments provided to

LEC by Metz and any sales and use taxes imposed on Metz's fees or other charges to LEC pursuant to this Agreement.

    5.4    LEC shall be responsible for the payment when due and payable of any taxes, fees, assessments or licenses being due any taxing authority resulting from any new taxes, legislation or enforcement position effectuated after the Effective Date hereof, but not for any increase in rates of the taxes to be collected and paid by Metz.

    5.5    Neither party hereto shall discriminate because of race, color, religion, sex, age, national origin, sexual orientation, known disability or status as a Vietnam era veteran or disabled veteran, and as further defined and prohibited by applicable federal, state, and/or local government laws, regulations, or ordinances, in the recruitment, selection, training, utilization, promotion, termination, or other employment-related activities concerning food service personnel. The parties further agree to comply with the provisions of the Americans with Disabilities Act (ADA), and any changes to the physical facility necessary to comply with ADA shall be the responsibility of LEC.

<strong>ARTICLE 6</strong>
<strong><u>MANAGEMENT EMPLOYMENT RESTRICTION</u></strong>

    6.1    LEC acknowledges and agrees that Metz has provided to its employees, on a confidential basis, the Proprietary Information as defined in Article 10 below and that Metz has further made a significant investment of time, money and other resources in training its employees with respect to Metz's methods, procedures and systems. Accordingly, LEC agrees that during the term of this Agreement (including any extensions or renewals thereof) and for a period of one (1) year following the expiration, termination or non-renewal of this Agreement (the "Period of Restriction"), it shall not directly or indirectly hire, authorize the hiring and/or permit the hiring (including employment by any successor contractor) of current or former management personnel of Metz to work as part of or in connection with the LEC food service program or programs (whether at the Facility that is the subject of this Agreement or elsewhere) nor shall it directly or indirectly, on its own behalf or in the service of or on the behalf of others, solicit or contact current or former management personnel of Metz or its related or affiliated entities in an attempt to hire or employ said personnel. For purposes of this Section 6.1, "former management personnel" shall mean a person that was employed by Metz in a managerial or supervisory capacity during the term of this Agreement and any extension or renewal thereof.

    6.2    LEC acknowledges that the restrictions contained in Section 6.1 of this Agreement are reasonable and necessary in view of the nature of Metz's business and in order to protect the legitimate business interests of Metz. LEC further acknowledges that LEC violations of the restrictions, or any one of them, would result in irreparable injury to Metz. Therefore, LEC acknowledges that, in the event of the violation or threatened violation by LEC of any of the restrictions set forth in Section 6.1, Metz shall be entitled to obtain from any court of competent jurisdiction, without being required to post a bond, preliminary and/or permanent injunctive relief restraining LEC from any violation of these sections. Moreover, LEC agrees that, in the event of the violation by LEC of any of the restrictions set forth in Section 6.1, LEC shall pay to Metz, at Metz's election, an amount equal to 1.5 times the annual salary of the person or persons hired in violation of Section 6.1, which amount is to be considered to be liquidated damages and not a penalty.

## ARTICLE 7
## INSURANCE AND INDEMNITY

    7.1    Metz agrees to maintain the following insurance coverage for the duration of this Agreement:

| Coverage | Minimum Limits |
|---|---|
| Worker's Compensation | Statutory |
| **Commercial General Liability** | |
| Combined Single Limit | $1,000,000 |
| OR | |
| Bodily Injury | $1,000,000 each occurrence |
| AND | |
| Property Damage | $1,000,000 each occurrence |
| **Automobile Liability** | |
| Combined Single Limit | $1,000,000 |
| OR | |
| Bodily Injury | $1,000,000 each occurrence |
| AND | |
| Property Damage | $1,000,000 each occurrence |
| Excess/Umbrella Liability | $10,000,000 each occurrence and aggregate |

LEC shall be listed as an additional insured, to the extent LEC is indemnified pursuant to the indemnification provisions of this Agreement. Metz shall invoice LEC for such insurance coverage based upon Metz's company-wide rate applied to managed volume and LEC shall pay such invoices in accordance with Article 2 hereof.

    7.2    LEC shall assume all liability for and shall indemnify, defend and hold harmless Metz and its officers, directors, shareholders, employees and agents, and each of them, in their individual and corporate capacities from any liability or damage any of them may incur, including reasonable attorneys fees, as a result of claims, demands, costs, or judgments of any kind or nature, by anyone whomsoever, related to any act of omission or commission by LEC or its officers, employees, or agents occurring on or before the Effective Date.

    7.3    Subject to Sections 1.4 and 7.5 hereof, Metz shall indemnify, defend and hold harmless LEC and its officers, directors, shareholders, employees and agents, and each of them in their corporate and individual capacities, from any liability or damage any of them may incur, including reasonable attorneys' fees, as a result of claims, demands, costs, or judgments of any kind or nature, by anyone whomsoever, arising out of or otherwise connected with any acts of Metz in violation of this Agreement or any negligent or intentionally wrongful acts or omissions of Metz or its officers, employees or agents, except to the extent such liability or damage is due to the negligence or fault or intentional wrongful acts or omissions of LEC. Metz's obligations to indemnify and the rights of LEC and its officers, directors, shareholders, employees and agents, to indemnification under this section shall survive termination or expiration of this Agreement.

    7.4    Subject to Section 7.5 hereof, LEC hereby agrees to indemnify and hold harmless Metz, its officers, directors, shareholders, employees and agents and each of them in their corporate and

Metz Culinary Management_ LEC(2019)      8

individual capacities, from any liability or damage any of them may incur, including reasonable attorneys' fees, as a result of claims, demands, costs, or judgments of any kind or nature, by anyone whomsoever, arising out of or otherwise connected with any acts of LEC in violation of this Agreement or any negligent or intentionally wrongful acts or omissions of LEC with respect to this Agreement, the ownership or maintenance of equipment, or operation of the Facility and/or the Program, except to the extent such liability or damage is due to the negligence or fault or intentional wrongful acts or omissions of Metz. The obligations of LEC to indemnify and the rights of Metz and its officers, directors, shareholders, employees and agents, to indemnification under this section shall survive termination or expiration of this Agreement.

7.5     Notwithstanding any other provision of this Agreement, with respect to property damage, for which the parties maintain a coverage for their respective property, each party waives its rights, to recover from the other party for loss or damage to such party's building, equipment, improvements and other property of every kind and description resulting from fire, explosion or other cause normally covered in standard broad form property insurance policies. This clause shall survive the termination of the agreement.

## ARTICLE 8

### FORCE MAJEURE

8.1     Neither Metz nor LEC shall have any liability for their respective failure to perform this Agreement when performance is prevented by force majeure. As used herein, the term "force majeure", shall mean any requirement or request of any governmental authority, war, public disorders, acts of enemies, sabotage, strikes, lockouts, picketing, labor or employment difficulties, fires, acts of God, accidents or breakdowns, whether or not preventable, or any similar or dissimilar cause beyond the reasonable control of either party.

## ARTICLE 9

### UNSATISFACTORY PERFORMANCE BY METZ

9.1     Notwithstanding anything to the contrary in Section 3.1 hereof, if LEC becomes dissatisfied with Metz's performance hereunder, LEC shall give Metz written notice detailing the specific aspects of Metz's performance hereunder with which LEC is dissatisfied and shall provide Metz a reasonable opportunity to respond to the notice within thirty (30) days after Metz's receipt thereof, by addressing with LEC the issues identified in the notice and by outlining for LEC the steps Metz intends to take, if any, to address such issues. Continued unsatisfactory performance by Metz after the foregoing thirty (30) day period shall be deemed a material default in Metz's obligations hereunder and a breach of this agreement and shall be cause for immediate termination of this Agreement by LEC.

## ARTICLE 10

### PROPRIETARY INFORMATION

10.1     During the term of this Agreement, each party acknowledges that it may acquire or obtain access to Proprietary Information of the other party. As used in this Agreement, "Proprietary Information" shall mean trade secrets or confidential information related to the business of Metz which includes, but is not limited to, technical and nontechnical data, information and depictions related to the operations, systems, computer programs, software, diet manuals, videotapes, methods, techniques, processes, finances (including but not limited to pricing, fee and cost information), actual or potential customers and suppliers, existing and future products, recipes, procedures, personnel manuals and procedures, and employment and staffing of Metz and its affiliates. As used in this Agreement,

"Proprietary Information" shall also mean trade secrets or confidential information related to the business of LEC, which includes, but is not limited to, the operations, systems, software, processes, finances, and employment and staffing, and names of students and all identifying information regarding students of LEC. Proprietary Information also includes but is not limited to information that has been stamped or otherwise designated by either party to be Proprietary Information or confidential and information disclosed to a party by a third party that that party is obligated to treat as confidential.

    10.2    All Proprietary Information and all physical embodiments thereof are confidential to and are and will remain the sole and exclusive property of the appropriate party. In the event either party receives, obtains access to or otherwise is exposed to any Proprietary Information of the other party, the receiving party shall and shall cause its officers, employees and agents to, (1) hold the Proprietary Information in trust and in strictest confidence, (2) not produce, use, distribute or otherwise disseminate the Proprietary Information or any physical embodiments thereof, except to the extent required by the lawful order of any court of competent jurisdiction or federal, state, or local agency having jurisdiction over the receiving party, provided that the receiving party shall give the other party prior notice of such disclosure such that the other party shall have the opportunity to obtain an order of court prohibiting or limiting such disclosure and (3) otherwise protect the Proprietary Information from disclosure.

    10.3    Disclosure of Proprietary Information by either party will not be made to anyone other than its own employees, directors, officers, agents, and/or consultants who are directly involved in performing the Services and have a specific need to know such information and who agree to hold the Proprietary Information in trust and strictest confidence in accordance with the terms of this Agreement. Both parties will take reasonable precautions to prevent disclosure of Proprietary Information to those employees without a need to know such information.

    10.4    Upon request by either party, and in any event upon termination of this Agreement, each party shall return all Proprietary Information and other property belonging to the other party, including without limitation, all tangible materials containing or embodying Proprietary Information then in the custody, control or possession of the party or its officers, employees or agents.

    10.5    If either party has any reason to believe that any of its officers, employees or agents has disclosed any Proprietary Information in violation of this Agreement, that party shall promptly notify the other party and shall cooperate with the other party to protect its interests in the Proprietary Information.

    10.6    Neither party shall disclose the economic terms of this Agreement to any third party, with the exception of its own employees, Directors, officers, agents, and/or consultants, and except as or to the extent required by law or the lawful order of any court of competent jurisdiction or federal, state, or local agency having jurisdiction over either party, provided that each party shall give the other party prior notice of such disclosure such that the other party shall have the opportunity to obtain an order of court prohibiting or limiting such disclosure.

## ARTICLE 11

### FINANCE AND AUDIT

    11.1    Metz agrees to comply with the following requirements governing the maintenance and availability of records and documentation:
    (a)    Metz shall maintain, during the Term and at no additional charge to LEC, complete and accurate records and supporting documentation pertaining to: (i) the compensation, charges and all financial matters under this Agreement, including but not limited to expenditures made by Metz in connection with the Services, gross revenues and profits from sales, payroll for Metz Personnel and other

labor costs, and (ii) all other transactions, reports, filings, returns, analyses, data and/or information created, generated, collected, processed or stored by Metz and/or Metz's subcontractors in the performance of the Services (including information in connection with Metz's compliance with applicable Laws); and (iii) all controls relevant to Metz's internal controls and LEC control over the activities of Metz in connection with the Services (collectively, the "Metz Records"), all in a manner sufficient to permit the audits in accordance with this Section 11.1.

(b) Upon reasonable advance notice from LEC or as otherwise set forth in this Agreement, during the Term of this Agreement and for a period of three (3) years following the furnishing of Services pursuant to this Agreement, Metz shall provide LEC and LEC Auditors with reasonable access to (i) any Metz facilities and all areas in such facilities in which Services are performed, (ii) any subcontractors performing any part of the Services, (iii) the Facility, (iv) any Metz information system containing information regarding the Services, and (v) the Metz Records. Such access shall include, but not be limited to, the right: (x) to enter and inspect any facility in which Services are performed, (y) to photocopy Metz Records and retain copies of the same in any medium; and (z) to interview Metz Personnel or subcontractors regarding the Services. In addition, upon written request made by any Governmental Authority, or by LEC in response to a request from a Governmental Authority, Metz shall promptly make available any Metz Records and other information relating to Metz's or its subcontractors' performance hereunder.

(c) If an audit performed hereunder reveals that errors have been made in connection with the Compensation, Charges or Taxes, then the parties will work together to correct the error and any overpayments revealed by the audit will be promptly paid by Metz or credited to LEC.

## ARTICLE 12
## Relationship Management

12.1 During the Term, Metz will designate a senior-level individual who will be primarily dedicated to LEC account (the "Metz Contract Manager"). The Metz Contract Manager (i) must be acceptable to and approved in advance by LEC, (ii) will be the primary contact for LEC in dealing with Metz under this Agreement, (iii) will have overall responsibility for managing and coordinating the delivery of the Services, (iv) will meet regularly with the LEC Contract Manager, and (v) will have the power and authority to make decisions with respect to actions to be taken by Metz in the ordinary course of day-to-day management of the LEC account in accordance with this Agreement. Subject to the LEC approval rights set forth above, Metz may from time to time replace the individual serving as the Metz Contract Manager by providing written notice to LEC.

12.2 During the Term, LEC will designate a senior level individual (i) who will serve as the primary contact for Metz in dealing with LEC under this Agreement, and (ii) who will have the power and authority to make decisions with respect to actions to be taken by LEC in the ordinary course of day-to-day management of this Agreement (the "LEC Contract Manager"). LEC may from time to time replace the individual serving as the LEC Contract Manager by providing written notice to Metz.

12.3 During the Agreement Term, the Metz Contract Manager and the LEC Contract Manager (and any other appropriate operational personnel) shall meet periodically, at such intervals and at such times and locations as mutually agreed by the parties or as reasonably requested by LEC to review Metz's performance under this Agreement and to discuss planned or anticipated activities that may affect the Services.

12.4 LEC has a resident Food Service Committee which meets periodically during the academic year to evaluate the dining service operations, make recommendations for desirable changes

Metz Culinary Management_ LEC(2019)          11

and plan special dining events. Proper management personnel of Metz shall attend these meetings and consider recommendations made through the Committee.

## ARTICLE 13

## MISCELLANEOUS

13.1   All notices and communications permitted or required by this Agreement shall be via electronic mail or in writing; any writing shall be mailed by certified or registered mail, return receipt requested, postage prepaid or shall be hand delivered to the other party, at the address set forth above (or at such other address as either party shall designate in writing to the other party during the term of this Agreement, or any extension or renewal thereof). In addition, LEC shall also deliver a copy of any and all notices to Metz at the Facility by hand delivering such copy to the Metz Contract Manager, and Metz shall also deliver a copy of any and all notices to LEC by hand delivering such copy to the LEC Contract Manager. Notices shall be deemed received upon actual receipt by the addressee.

13.2   In case one or more of the provisions contained in this Agreement, or parts hereof, should for any reason be held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, the same shall not affect any other provision in this Agreement, or part hereof, but rather this Agreement shall in that event be construed as if such invalid, illegal or unenforceable provision, or part hereof, had never been contained herein. The parties intend that if any provision of this Agreement is susceptible to two or more constructions, one of which would render the provision enforceable and the other or others of which would render the provision unenforceable, then the provision shall be given the meaning that renders it enforceable.

13.3   This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, notwithstanding any additional, conflicting or different terms that may be contained in any statement, communication, quotation, acknowledgment, confirmation, purchase order, invoice, billing, or other form of either party. Further, neither party has relied on any representation, promise, agreement, condition or understanding which is not expressly set forth herein. The terms of this Agreement may not be amended or modified except by a further written statement signed by the parties hereto that specifically references the intent of the parties to amend or modify this Agreement. For the purposes of this Section, any such amendment or modification must be executed by a Vice-President of Metz and a Vice-President of LEC.

13.4   This Agreement and the rights and obligations of the parties hereto will inure to the benefit of, will be binding upon, and will be enforceable by LEC and Metz, and their lawful successors, representatives and assigns.

13.5   If either party deems it necessary to enforce this Agreement by or through an attorney at law, the prevailing party shall pay to the non-prevailing party, upon demand, all costs and expenses incurred in connection with such enforcement, including, without limitation, reasonable attorney's fees. No failure or delay on the part of either party hereto in exercising any right or remedy under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or of any other right or remedy. All remedies are cumulative hereunder. No provision of this Agreement may be waived except in writing signed by the party granting such waiver. For the purposes of this Section, any such waiver must be executed by a Vice President of Metz and a Vice President of LEC.

13.6   This Agreement will be governed by and construed in accordance with the laws of the State of Ohio.

13.7    No course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this Agreement. For the purposes of the interpretation of this Agreement and for the purposes of resolving any ambiguity herein, this Agreement was drafted by the joint efforts of both parties and no presumption shall be drawn in favor or against either of the parties by virtue of the Agreement's authorship.

13.8    All heading and captions appearing herein are inserted for purposes of convenience and reference only, and shall not be used to construe or interpret any provision hereof.

13.9    The parties acknowledge and agree that Metz is an independent contractor and this Agreement does not constitute or appoint Metz as an agent of LEC, which agency is hereby expressly disclaimed by Metz. LEC will have no right to control the means or method by which Metz performs the Services; the interest of LEC in such respect is to ensure that the Services are performed in a competent, efficient, professional, satisfactory, and legal manner, in accordance with the terms of this Agreement. Neither party shall hold itself out as, a partner, joint-venturer, agent, employee, or legal representative of the other, and neither party is otherwise authorized to act for or on behalf of the other as a result of this Agreement or any other agreement and neither party can act for nor legally bind the other. Neither party is authorized to make any agreement, warranty, covenant, or other representation nor to create any obligation, express or implied, on behalf of the other, nor shall either party represent that it has any right or power to do so.

13.10    Neither LEC nor Metz shall be liable to the other or shall make any claim for any incidental, indirect, consequential or punitive damages arising out of, or connected in any way to the Program, the Services or this Agreement. This mutual waiver includes, but is not limited to, damages related to loss of use, loss of profits, loss of income, loss of reputation, unrealized savings or diminution of property value and shall apply to any cause of action including negligence, strict liability, breach of contract and breach of warranty.

13.11    Except as expressly set forth in this Agreement, neither party makes, and each such party hereby specifically disclaims, any and all representations and warranties express or implied, arising by law or otherwise, arising under or relating to this Agreement or the subject matter of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered, in duplicate, by their duly authorized officers, effective as of the Effective Date.

ATTEST

METZ CULINARY MANAGEMENT, INC.:
BY: _____
PRINT NAME: Greg Pou_
TITLE: COO

ATTEST

LAKE ERIE COLLEGE:
BY: Brian F Dirk
PRINT NAME: BRIAN DIRK
TITLE: CFO

Metz Culinary Management_ LEC(2019)        13